WALTER I. BONES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1666.   Promulgated December 6, 1944.

*Chester W. Johnson, Esq.,* for the petitioner.
*Edward C. Adams, Esq.,* for the respondent.

HARRON, *Judge*: The respondent determined a deficiency in income tax for the year 1941 in the amount of $6,760.73. The questions relate to whether two items constituted income to petitioner in the year 1941. Petitioner contends that both items were taxable to him in 1942 rather than in 1941, as respondent has determined. The items which give rise to the two questions presented are a check and a promissory note which were received by petitioner in 1941. The check was not deposited until 1942 and the note was due in 1942. Petitioner filed his return with the collector for the district of Minnesota.

#### FINDINGS OF FACT.

*Issue 1.*—Petitioner is an individual residing in Minneapolis, Minnesota. He reported income from salaries, commissions earned, and interest and rents received, on the cash basis.

During the taxable year petitioner was a branch manager for the Altorfer Bros. Co. of Peoria, Illinois, which manufactured and sold washing machines and other household appliances. Petitioner's employment with the Altorfer Bros. Co., hereinafter referred to as Altorfer, commenced on December 1, 1939. No formal contract of employment was executed by the parties, but petitioner received a letter

dated December 1, 1939, from Altorfer, signed by H. W. Altorfer, its vice president and general manager, stating that the "arrangement" was "to continue as long as mutually satisfactory." The letter also provided that petitioner was to receive an annual salary of $15,500, payable in equal monthly installments, and a commission of 1½ percent on all business negotiated by him or by his organization in a designated territory covering nine states.

On November 26, 1941, Altorfer, by H. W. Altorfer, informed petitioner, in writing, that his services had not proven satisfactory; that "the connection" was to be terminated as of November 30, 1941; and that "checks in full payment of all salary and commissions, up to and including November 30, 1941, will be given you by Mr. Broderick not later than December 3, 1941." On December 1, 1941, Altorfer, by E. C. Huisman, its comptroller, sent a letter to petitioner enclosing "in full of all liabilities of Altorfer Bros. Company to you for services rendered, salary check in the amount of $645.00 and commission check in the amount of $11,052.40, both payable to your order." The salary and commissions which Altorfer claimed were due to petitioner aggregated $11,727.40, the total of the two sums above, but $30 thereof was withheld by Altorfer as payment for social security taxes. Attached to the check for $11,052.40 was a voucher which carried the notation, "In full of all commissions under letter of December 1, 1939." This voucher was detachable and was to be detached prior to the presentation of the check for payment. The letter of December 1, 1941, also contained a statement of account from Altorfer dated November 30, 1941, showing unpaid commissions as of October 31, 1941, amounting to $9,998.62, and commissions earned in November 1941, amounting to $1,053.78—total $11,052.40.

Upon receipt of the letter of December 1, 1941, containing the check and the statement, petitioner computed the amount of commissions due him and found that the statement did not cover the full amount. The statement by Altofer included only orders which had been shipped from the company's plant. Petitioner had sent orders to Altorfer for machines and repair parts which had been accepted by Altorfer but had not been shipped as of November 30, 1941. These orders were not reflected in the statement of November 30, and it did not set forth any commissions due on such orders.

During the period from December 1, 1939, to December 1, 1941, petitioner had not received any commissions from Altorfer, although he had attempted to collect amounts on account of commissions at various times. The practice of the company was to send monthly statements to petitioner showing the monthly and the aggregate commissions earned by petitioner as computed by Altorfer, but no payments of commissions accompanied the statements.

On December 26, 1941, petitioner wrote to Altorfer, acknowledging the letter of December 1 and inquiring whether the statement and commission check included "all sales made including. shipments which were made to dealers on open account and which were not paid for." On December 29, 1941, Altorfer wrote petitioner that the statement included "every sale made up to and including the last day of November, whether they be sight draft shipments or open account shipments." This letter, however, did not answer petitioner's query as to whether the statement included all sales made.

On January 31, 1942, petitioner wrote to Altorfer stating that he expected commissions on all acceptable orders which had not been shipped. He also called attention to the fact that the "settlement" by Altorfer had not taken into account interest on earned commissions which had not been paid. He also stated that he had advanced money to promote the sale of washing machines in good faith in his efforts to build up profitable accounts, and that he felt that he should be reimbursed for such advances. He pointed out that he had entered into the arrangement originally upon representations relating to the extent of the business in the area which later he had found to be untrue. He concluded his letter with the following: "I am anxious to make settlement with you at an early date, and will appreciate hearing from you further by return mail."

Petitioner retained possession of the check for $11,052.40 from the time of its receipt in December 1941 until February 20, 1942, when he was informed by Altorfer's comptroller that the company would be willing to settle with him on a fair basis. He understood this to mean that Altorfer would not insist that the check offered would constitute payment in full of all commissions, as stated on the voucher, but that further payment of earned commissions would be made. Petitioner did not have that understanding of the matter at any time prior to February 20, 1942. Acting upon such understanding, petitioner deposited the check in his bank account at the Northwestern National Bank on February 20, 1942.

Thereafter, petitioner continued correspondence with Altorfer's representatives. Finally he engaged the services of an attorney. He claimed that he was entitled to commissions on orders obtained prior to December 1, 1941, but shipped after that date. He also claimed that the company was unfair in terminating his employment on 4 days notice while at the same time continuing to use his organization. He claimed that he should have received 15 to 30 days notice. In addition, he claimed that he should be reimbursed for moneys advanced to dealers in building up the organization, and also commissions on orders for old type machines which were accepted by the company but were not shipped because of the discontinuance of the model. Throughout

the correspondence there was a question about the additional amount of the commissions due petitioner, Altorfer's estimate amounting to $623.73, only, whereas petitioner claimed $1,057.19, both amounts representing commissions over and above the sum of $11,052.40. Altorfer denied liability for any of the other claims made by the petitioner. On November 30, 1942, the dispute between Altorfer and petitioner was finally settled by the payment by Altorfer of an additional $2,000 to petitioner.

Petitioner, in his 1941 Federal income tax return, reported the receipt of the salary item in the amount of $645, but he did not include in income the sum of $11,052.40. He included that amount in income in his 1942 return.

The respondent increased petitioner's 1941 income by the amount of $11,082.40 on account of the receipt of the commission check in the sum of $11,052.40 and the $30 social security tax withheld by Altorfer.

In 1941 the amount of commissions due petitioner was not determined. A *bona fide* dispute existed between petitioner and Altorfer over the full amount due which was not finally settled until November 1942. The forwarding of the check for $11,052.40 to petitioner in December 1941 was an offer subject to the condition that the check constituted payment in full of all commissions due. Petitioner's view was reasonable that if he accepted the payment he also was accepting the condition. The condition was removed by Altorfer in February 1942, after which petitioner deposited the check, but the check was subject to the condition up to that time. The offer of the check by Altorfer in 1941 did not result in petitioner's constructive receipt of income in that year.

OPINION.

The question presented is whether petitioner, reporting income on a cash basis, is taxable in 1941 upon commissions in the net amount of $11,052.40. Petitioner waives contest of the item of $30, social security tax withheld by Altorfer in 1941, which respondent has added to his income for the taxable year, in addition to the net amount of the check for commissions.

Respondent argues that petitioner received the sum in question under a claim of right and, that, therefore, it constituted income to petitioner in the taxable year. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. Respondent contends that it is not material or determinative that the circumstances surrounding the receipt of the check were such that petitioner might have to surrender or repay the money in a later year in the event settlement of his claim should be adverse to his contentions. In short, it is the view of the respondent that the doctrine of constructive receipt of income should be applied

here on the theory that there was credited to petitioner the sum of $11,-052.40, that such sum was subject to his control and available to him, and that his election to delay until 1942 reducing to possession that which was made available to him in 1941 can not relieve him from liability for tax thereon in 1941. Respondent cites in support of his view the following: *Alexander Zolotoff*, 41 B. T. A. 991; *William Parris*, 20 B. T. A. 320; *Commissioner* v. *Alamitos Land Co.*, 112 Fed. (2d) 648; certiorari denied, 311 U. S. 679; *Brown* v. *Helvering*, 291 U. S. 193. Respondent does not admit that the check received in 1941 represented a conditional payment.

Petitioner contends, in substance, that the facts show that his claim in 1941 against Altorfer for commissions, as well as other items of compensation, was a disputed and unliquidated claim; that the forwarding by Altorfer to him of the check in question constituted an offer, only, and that he refused to accept the offer upon the condition upon which it was made in 1941, under legal right to refuse an offer. Petitioner contends that the situation was such that his acceptance of the check in full payment of commissions would have effected an accord and satisfaction of the disputed claim. Petitioner points out that the dispute was not settled and could not have been settled in the short time remaining in the year 1941. He argues that Altorfer's comptroller, by his assurances in February of 1942 that a fair settlement would be made, relieved him of treating the statement on the voucher attached to the check as a condition. Petitioner cites many authorities which set forth the law of what constitutes an accord and satisfaction where a dispute between parties exists as to the liability of a debtor to his creditor, among which are the following: *Jones* v. *Campbell*, 92 Vt. 19; 102 Atl. 102; *Nassoiy* v. *Tomlinson*, 148 N. Y. 326; 42 N. E. 715.

The question must be determined by the facts, and the differences between the petitioner's and the respondent's contentions are to be found mainly in the differences in their respective views of the facts. We find two facts to be of primary importance: (1) In 1941 the amount of commissions to which petitioner was entitled was not fixed and did not become fixed until November 1942; (2) the check tendered petitioner in December 1941 represented an offer upon the condition that it be accepted in full settlement and payment of all claims of petitioner to commissions. That is beyond question. The voucher attached to the check stated that the amount constituted "In full of all commissions." The facts in general show that the claim of petitioner for commissions was a disputed claim.

Petitioner rests his argument upon the theory that the situation was such that, if he had accepted Altorfer's check in 1941, an accord and satisfaction would have been effected and thereafter he could not have made successfully further claim for payment of an additional

amount of commissions on accepted orders. The question of what constitutes a contract of accord and satisfaction is not easily determined, and we do not consider it essential to the disposition of the question presented to make any definitive holding on the argument that acceptance of the check by petitioner would have constituted an accord and satisfaction. There is much to indicate that it would have effected that result. We believe it necessary only to consider whether petitioner had a legal right to refuse to accept the check offered in full payment of commissions in 1941, or whether petitioner was simply rejecting income which was wholly subject to his command. Cf. *Hamilton National Bank of Chattanooga, Administrator*, 29 B. T. A. 63, 66, where the taxpayer had no legal right to refuse payment of income due him and the doctrine of constructive receipt was applied. We conclude that the circumstances were such that petitioner could reasonably and prudently understand his position to be such that if he accepted the offer which was made upon the condition stated an accord and satisfaction would have resulted. Under this conclusion, based upon our understanding of the facts, petitioner had a legal right to refuse to accept the offer made by Altorfer in 1941. When in February 1942 he deposited the check which he had received in December 1941, he had been given substantial assurance that the payment of the amount offered was no longer subject to the condition. Prior to February 1942 the offer was subject to that condition beyond doubt. Under the Commissioner's regulations, a payment subject to a condition does not constitute constructive receipt of income not reduced to possession. See sec. 19.42–2 of Regulations 103, pp. 190 and 191.

The situation here resembles that in *W. A. Graeper*, 27 B. T. A. 632, 637, where the doctrine of constructive receipt was not applied. There we held that there was no constructive receipt of rentals in the year in which the amount of rent was not yet fully determined, even though rent in some amount was due in the taxable year. In this case the amount of commissions due petitioner was in dispute and was not fixed in the taxable year.

The *Parris* case is distinguishable. In the *Parris* case the taxpayer rejected payment of royalties by refusing to sign a required document. He owned an interest in property which produced the royalties. His right to the royalties due was an established right. His dispute and the legal actions he had instituted related to ownership of other interests in oil properties which, if his legal actions were successful, would have yielded additional royalties. There was no dispute relating to the royalties from the lease or the land in which the interest of the taxpayer was firmly established.

In this case the offer made in 1941 by Altorfer to pay petitioner $11,052.40 in full payment of commissions was subject to the condition

stated. The check and the condition were inseparable. It can not be said that petitioner *received* the sum covered by the check in 1941 when he clearly rejected the condition. In fact he rejected the entire offer in 1941. See *Fuller* v. *Kemp*, 138 N. Y. 231; 33 N. E. 1034; Williston on Contracts, vol. 6, sec. 1854; Restatement of the Law of Contracts, sec. 420; 1 R. C. L., p. 176 and ff.

Respondent's determination under this issue is reversed.

### FINDINGS OF FACT.

*Issue 2.*—During the taxable year petitioner owned and operated farms in the States of South Dakota and Minnesota and, in addition, owned and rented farms in the States of Iowa and Colorado. He consistently reported farm income partly on the cash basis and partly on an inventory basis. The farm income is on a cash basis and the costs and expenses are on a cash basis, except for the livestock, which is inventoried. Petitioner reported his farm income for the taxable year as follows:

| | | |
|---|---:|---:|
| Sales of livestock, fair premiums, etc | | $42, 019. 21 |
| Cost of products sold: | | |
| Inventories at beginning of year | $28, 409. 50 | |
| Purchases | 587. 07 | |
| | 28, 996. 57 | |
| Less inventories at end of year [*sic*] | 34, 404. 50 | |
| | | 5, 407. 93 |
| Gross profit | | 47, 427. 14 |
| Other income: | | |
| Soil conservation payments, etc | | 3, 939. 58 |
| Gross income | | 51, 366. 72 |
| Expenses: | | |
| Advertising | $2, 872. 37 | |
| Board and meals | 1, 223. 95 | |
| Feed and seed | 5, 300. 50 | |
| Gasoline and oil | 2, 394. 12 | |
| Insurance | 398. 09 | |
| Labor | 14, 189. 01 | |
| Loss on dead horses | 281. 25 | |
| Rent | 875. 00 | |
| Repairs to buildings | 1, 714. 92 | |
| Repairs to machinery | 2, 458. 91 | |
| Taxes | 2, 295. 67 | |
| Depreciation | 5, 125. 97 | |
| Unclassified | 1, 889. 01 | |
| Fair expenses: | | |
| Freight and drayage | 73. 70 | |
| Unclassified | 280. 06 | |
| | | 41, 372. 53 |
| Net profit | | 9, 994. 19 |

On his farm at Parker, South Dakota, petitioner raised for sale, for breeding purposes only, registered Hereford cattle. During the taxable year petitioner sold five registered cows and one registered bull to one Dwan of Minneapolis and received therefor Dwan's promissory note in the face amount of $2,750, payable in 1942. This note was worth its face value at the date of its receipt by petitioner in 1941. At the time of the sale, petitioner orally guaranteed Dwan that the cows had been mated to a particular bull and that they would have live and standing calves. The note was paid by Dwan in 1942, but petitioner allowed an adjustment of $75 because one of the calves was black.

Petitioner did not report any part of the $2,750 as income in his Federal income tax return for 1941. However, he included the five cows and the bull in his 1941 closing inventory and in his 1942 opening inventory. Petitioner reported the proceeds of Dwan's note in his 1942 Federal income tax return.

Respondent, in the notice of deficiency, increased petitioner's 1941 income by $2,750.

### OPINION.

The general principle is well established that, where property is exchanged for notes, income is realized to the extent that the fair market value of the notes exceeds the basis of the property. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462. In this proceeding respondent determined that the note delivered to petitioner by Dwan in the taxable year was worth its face value at the time of delivery. The burden of proving otherwise was upon petitioner. At the hearing petitioner did not offer any proof to show that the note had no fair market value when received, other than his testimony that he orally guaranteed Dwan that the cows sold would have live and standing calves. It is his contention that this guarantee effected a conditional sale contract which would require him to take back the cattle if the representation was not fulfilled.

Petitioner did not introduce a copy of the note in evidence. Apparently, it was a negotiable promissory note, with no restriction upon its disposition. As such, petitioner could presumably have sold or discounted the note and thus realized the proceeds. Petitioner has not shown that his agreement with Dwan prevented him from transferring or otherwise disposing of the note. The only effect of the agreement was that petitioner may have been required to restore a portion of the equivalent of the note in a subsequent year. That this is the correct interpretation of the agreement is indicated by the fact that an adjustment of $75 was made in 1942 at the time the note became due and payable. The law is settled that, if a taxpayer

derives a profit without restriction as to its disposition, it is income even though there is a contingency which may require him to restore its equivalent in a later year. *First National Bank* v. *Commissioner*, 107 Fed. (2d) 141; *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. Here, petitioner's right to use the note was absolute when received, since it was given under no restriction as to its disposition, use, or enjoyment.

An argument which is similar to the argument which petitioner now makes was rejected by us in *D. D. Oil Co.*, 3 T. C. 5, 11. In that case, we said:

The face value of the notes was $66,668. They were given under the agreement, and the remaining $33,332 of the $100,000 notes were paid when due in 1939. The $66,668 of notes were paid according to their terms within the following year, at or before their maturity. But petitioner says that in 1939 they were without market value, largely because they were secured by the contract and there was no assurance that the contract would be fulfilled or would be fruitful. This, however, is not enough to indicate that the promissory notes in 1939 were without value. The inference is rather the other way, that they had full value subject to the possibility of a rescission of the contract upon the happening of a condition subsequent. In 1939 there was no reason to treat this as probable, and very soon it turned out not to be a fact. We think the evidence does not establish that the notes were worth less than their face value. * * *

Accordingly, we have found as a fact that Dwan's note was worth its face value at the time of its receipt by petitioner. Respondent's determination that the face amount of the note represented taxable income to petitioner in 1941 is sustained. However, the record is clear that petitioner, who reported gains from the sale of cattle on the inventory basis, included the five cows and the bull in his closing inventory for the taxable year. The return must, therefore, be adjusted to eliminate these animals from such inventory or a distortion of income will result. Accordingly,

*Decision will be entered under Rule 50.*